IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | CRIMINAL ACTION FILE |
| | : | NO: 2:10-CR-016-RWS-SSC |
| ZACHARY GRIFFIN, | : | |
| DAVID JUDGE, and | : | |
| LAWRENCE DAWSON, | : | |
| Defendants. | : | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
AND ORDER CERTIFYING CASE READY FOR TRIAL**

Before the court is the Motion to Suppress Evidence filed by Defendant Zachary Griffin ("Defendant Griffin" or "Griffin") [Doc. 39] and the Motion to Suppress filed by Defendant David Judge ("Defendant Judge" or "Judge") [Doc. 41]. Defendants seek to suppress evidence seized during a warrantless search on March 30, 2010 in Jefferson, Georgia of an automobile driven by Defendant Judge, in which Defendant Griffin was a passenger. For the reasons that follow, it is **RECOMMENDED** that Defendants' motions be **DENIED**.

**Procedural History**

In an indictment filed on April 6, 2010 [Doc. 18], Defendants Griffin and Judge were charged with aiding and abetting Co-Defendant Dawson— all of whom are alleged not to be a licensed firearms importer, manufacturer, dealer, or collector— in willfully attempting to transfer, sell, trade, give, transport and deliver

firearms to a person not a licensed importer, manufacturer, dealer, or collector of firearms and who Defendants knew and had reasonable cause to believe was not then residing in Defendants' state of residence, in violation of 18 U.S.C. §§ 922(a)(5), 924(a)(1)(D) and 2 (Count One).  Defendant Griffin was also charged with knowingly possessing an unregistered silencer in violation of 26 U.S.C. §§ 5841, 5845(a)(2), 5861(d) and 5871 (Count Two), and Defendant Judge was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count Four).[1]  According to the indictment, on or about March 30, 2010, Defendants, while residing in South Carolina, attempted to transfer, sell, etc. a "GSG, GSG-5 Rifle, .22 with an attached silencer," "a Ruger, .22 Pistol," and "a Springfield Armory .45 Pistol" to "Tiger LNU or TITAN LNU," who was not then residing in South Carolina.  (Id.).

Defendants Griffin and Judge filed their respective motions to suppress evidence on April 19, 2010 [Doc. 39] and April 20, 2010 [Doc. 41].[2]  The undersigned conducted an evidentiary hearing on those motions on June 14, 2010 [Doc. 61], and a transcript of that hearing was filed on June 29, 2010 [Doc. 62].  On July 23, 2010, Defendant Griffin filed a post-hearing brief [Doc. 70], which Defendant Judge has adopted (see Docs. 71, 72).  The Government filed a brief

---

[1] The indictment recites that Defendant Judge was convicted of possession of cocaine, a crime punishable by imprisonment for a term exceeding one year, on or about December 9, 1999 in LaPorte Superior Court, Indiana. [Doc. 18].

[2] Defendant Dawson also filed a motion to suppress [Doc. 44], but he has withdrawn that motion (see Doc. 68).

2

in response to Defendants' post-hearing brief on August 6, 2010.  [Doc. 74].

## **Findings of Fact**[3]

During the hearing on Defendants' motions to suppress, the Government presented the testimony of Officer Jay Parker, a police officer with the Jefferson Police Department in Jefferson, Georgia.  (Tr. 8-9).  The undersigned's findings of fact are derived from that testimony.

At approximately 2:00 p.m. on March 30, 2010, Officer Parker was in his vehicle, which was stationary in the median on the southbound side of Interstate 85, perpendicular to the highway, in Jackson County, Georgia.  (Tr. 9-10, 40-41). He observed a burgundy Lincoln Town Car in the left lane; it was passing vehicles in the right lane that he estimated were traveling about 70 miles per hour, the speed limit in that area.  (Tr. 10, 69).  Parker has been "trained in speed detection" for nine or ten years, and he was "trained to give visual estimations on vehicles as well as to check that with [his] radar unit."  (Tr. 10).[4]  Although his radar was on, the radar "did not pick up the vehicle" because of "the way [Parker] was sitting," but he visually estimated the speed at over 80 miles per hour.  (Tr. 10, 41, 68).

Officer Parker pulled out behind the Lincoln and "began pacing the vehicle,"

---

[3] These facts are taken from the evidence presented at the hearing on Defendants' motions to suppress.  Citations to the transcript are designated as "Tr. __."

[4] Parker explained that, during his training, he had "to give ten visual estimates of speed where the instructor . . . checks the speed with the radar," and he was required to give eight correct estimates.  (Tr. 68-69).

i.e., he traveled behind the Lincoln at the speed it was traveling in order to determine its speed. (Tr. 10-11). After he paced the Lincoln for "a little less than a mile," he saw that his speedometer was 87 miles per hour. (Tr. 11). Parker also observed the Lincoln twice cross the center line dividing the lanes. (Tr. 11, 45-46).

At that point, Parker initiated a traffic stop by activating his blue lights, and the Lincoln pulled over onto the right shoulder of the road. (Tr. 11-12). The camera, which "is set to come on when the lights come on," began recording the stop. (Tr. 12, 34-35; see also Gov't Ex. 1). Parker also recorded the audio portion of the stop with a microphone clipped to his belt. (Tr. 50-51). Parker approached the Lincoln on the passenger side for safety reasons, because there were vehicles traveling on the interstate at a high rate of speed. (Tr. 12, 47). He was in uniform, but he did not have his gun drawn. (Tr. 13-14).

Three people were in the Lincoln–Defendant Judge, who was driving, Defendant Dawson, who was in the front passenger seat, and Defendant Griffin, who was in the back seat. (Tr. 14-15, 22).[5] While standing at the front passenger door, Parker asked the driver, Defendant Judge, for his driver's license; Judge then reached down to open the center console. (Tr. 13-15). Parker "immediately noticed a clear plastic baggy with some ammunition in it, some bullets," and "for officer safety" he asked Judge if there were any weapons in the vehicle. (Id.). Judge responded that there were guns in the trunk. (Tr. 13, 15). At that point,

---

[5] The Lincoln was later determined to be registered to Lavondria Davis, and Defendant Judge stated Ms. Davis was his wife. (Tr. 60).

according to Parker, none of the defendants was free to leave. (Tr. 76).[6]

Parker then asked Judge "to step to the rear" of the Lincoln, and he complied. (Tr. 15). The other defendants remained in the vehicle while Parker spoke with Judge. (Tr. 15-16). Parker patted down Judge for safety, to make sure Judge was not armed, because Parker had seen the ammunition in the vehicle, and Judge had stated that there were guns in the trunk. (Tr. 16-17). Judge gave Parker a Michigan identification card, but did not produce a driver's license. (Tr. 16-17). Parker asked Judge if he had a driver's license, and Judge "said he wasn't sure," and he "thought maybe it was suspended for not paying a ticket." (Tr. 16). Parker asked him where they were coming from that day and where they were going, and Judge responded that they were coming from Greenville, and "they were going to Atlanta to visit some family because he had had a cousin Steve . . . that had recently died from cancer." (Id.). Judge told Parker that Defendant Dawson was his cousin, and Defendant Griffin was a friend. (Id.). Parker spoke with Judge in a conversational tone, and he described Judge's demeanor as "normal, [he] didn't seem to be real upset or anything," and he did not appear to be nervous. (Tr. 18-19).

Parker then went to the front passenger door, while Judge remained at the front of Parker's vehicle, and asked Dawson and Griffin for identification; Griffin produced identification, but Dawson did not have any. (Tr. 17-18). Parker asked

---

[6] The video of the stop shows that Parker told the driver that he was traveling at approximately 87 miles per hour and was having trouble staying in his lane. (Gov't Ex. 1).

for their identification because he "knew there were weapons in the vehicle, and [he] was going to check their histories to make sure they weren't convicted felons." (Tr. 55). Parker asked Dawson where they were coming from and where they were going, and Dawson "stated they were coming from Greenville, going to Atlanta to see a cousin of his named Titan." (Tr. 18).[7] Parker had not drawn his weapon, and he spoke with the men in a conversational tone. (Tr. 19). He described Dawson as "cooperative," and Griffin as "slightly nervous" and "moving around a good bit," but also "cooperative." (Id.).

After Parker received identification documents from Defendants Griffin and Judge, he requested that dispatch run a driver's license and warrants check on them. (Tr. 22-23, 62).

Officer Parker asked Judge if he could search the vehicle, if he "had any objections to [Parker] searching his vehicle," and Judge responded, "no, he didn't have any objections." (Tr. 20, 56, 76). Judge was "calm and cooperative." (Tr. 20). Prior to the search of the Lincoln, Judge told Parker that he "had done jail time for possession of cocaine in South Carolina." (Tr. 27, 78). Parker knew that possession of cocaine is a felony in South Carolina because he had worked in South Carolina. (Tr. 78).

Parker asked Dawson and Griffin to exit the Lincoln, and they did so; in response to Parker's questions, they stated that they did not have any weapons

---

[7] Parker considered this account to be in conflict with Judge's account. (Tr. 53-54).

6

or contraband on their persons, and each agreed to allow Parker to conduct a pat down search of his person. (Tr. 20-22). Parker asked Dawson and Griffin to step to the rear of the Lincoln where Judge stood. (Tr. 21; see also Gov't Ex. 1).

Parker's partner, Officer Wood, arrived on the scene, and he remained with the three defendants while Parker searched the Lincoln's interior and trunk. (Tr. 22-23, 30). In the interior, Parker found a silver pipe that "looked like it had been cut off and threaded at both ends"; Parker "wasn't real sure what that was for," but he "was kind of suspicious of it actually." (Tr. 23). He then opened and searched the trunk and found "two handguns, they were both black in color, and a black-in-color rifle with a collapsible stock and what appeared to be a suppressor on the end of it." (Tr. 23-24).[8] A "suppressor," otherwise known as a "silencer," is "a thick-looking pipe that's oftentimes put on the end of a barrel of a gun to suppress the noise level of the bullet and the actual sound of the gun so it's a lot quieter." (Tr. 24). Parker estimated that 20 minutes had elapsed from the time he made the traffic stop until he saw the weapons in the trunk. (Tr. 24-25).

Parker asked to whom the weapons belonged, and Defendant Griffin "stated that all three of the guns were his." (Tr. 24, 79-80). At that point, Parker's partner detained Griffin and placed him in the back of Parker's patrol car. (Tr. 24). He was not handcuffed, but he was not free to leave. (Id.). Although neither

---

[8] Parker also saw some paperwork, some suspected "bootleg" DVDs and a printer in the trunk; those items were not seized. (Tr. 32, 59-60).

Judge or Dawson, who were sitting on a grass embankment in the shade, was handcuffed at that point, they were not free to leave. (Tr. 24-25, 61).

Parker then contacted Agent Sharitt of the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and told Sharitt about the gun and the rifle with the suspected suppressor. (Tr. 25). Sharitt told Parker he would come to that location from Gainesville. (Id.). While Parker waited for Sharitt, who arrived in approximately 20 minutes, Parker continued searching the Lincoln to check "for any more weapons or contraband or compartments where weapons [might] be found," and he "asked dispatch to check criminal histories on all three of the subjects." (Tr. 26-27, 62).

At some point prior to Sharitt's arrival, Parker advised Griffin of his rights as set forth in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and he asked Griffin if he "would like to talk to [Parker] then." (Tr. 29). Griffin replied that he would, but he did not sign anything to that effect. (Tr. 29, 31). Griffin was "nervous but compliant," and he made statements to Parker about the rifle with the suppressor and repeated his assertion that all the weapons were his. (Tr. 30, 36, 61-62). Parker then continued his search of the Lincoln. (Tr. 30). At no point during his search did Judge tell him to stop searching. (Tr. 36-37).

When Agent Sharitt arrived, accompanied by ATF Special Agent Johnson, Sharitt examined the rifle with the suspected suppressor and made some phone calls to determine whether it was in fact a suppressor, and he and Parker discussed the weapons. (Tr. 27-28, 30, 32). "Right after Special Agent Johnson

and Sharitt arrived on the scene," Parker received a call from dispatch informing him that Dawson and Judge were both convicted felons, and Griffin did not have a criminal history. (Tr. 28, 36, 62-63). While they were on the scene, Sharitt received confirmation by telephone that the item was a suppressor. (Tr. 28).

Approximately 20 to 30 minutes elapsed from the time Sharitt arrived until the officers left the location. (Tr. 28-29). Defendants were not handcuffed and placed under arrest until the officers "got ready to leave." (Tr. 28-29). Parker seized three weapons, ammunition and two to three cell phones. (Tr. 64). Defendants were then transported to the Jefferson County Police Department and interviewed by ATF Agents Sharitt and Johnson. (Tr. 30-32, 35-36). Parker did not issue Judge a ticket for speeding and failure to maintain lane. (Tr. 31-32).

Parker estimated that he was at the scene on I-85 for a "[l]ittle over an hour." (Tr. 31).

## Analysis and Conclusions of Law

Defendants argue that any evidence seized from the Lincoln on March 30, 2010, and any statements they made to law enforcement officers during the traffic stop at issue, must be suppressed because: 1) Officer Parker did not have "a valid reason to stop the vehicle"; 2) "[t]here is no credible evidence consent to search was given"; 3) Defendants made certain statements without having been advised of their rights under Miranda; and 4) statements made after advice of Miranda rights was given were a product of the illegal stop and subsequent illegal search

9

of the Lincoln. (Doc. 70, Def. Br. at 10, 13, 15, 16, 19).[9]

## A.   The initial stop

The Government argues that Officer Parker had probable cause to stop the Lincoln for speeding, in violation of O.C.G.A. §§ 40-6-180 and 40-6-181, and for failure to maintain lane, see O.C.G.A. § 40-6-48, based on his observations of those violations. (Doc. 74, Gov't Br. at 7-9).

Defendants argue that Parker's testimony is not credible because Parker's estimation that the Lincoln's speed was 84 to 85 miles per hour when it passed Parker was "just a guess," and because it is "physically impossible" for Parker to have caught up to the Lincoln within half a mile when the Lincoln was traveling at 87 miles per hour. (Doc. 70, Def. Br. at 11-12).[10] Defendants also argue that "[a] person traveling eighty seven miles per hour on I-85 that is being followed by a marked patrol vehicle would slow down"; that, even though Parker "had already determined he was going to pull the Lincoln over[,] he did not turn on the video

---

[9] The Government contends that Defendant Griffin, as a passenger, "lacks standing to challenge the legality of the search of the vehicle . . . ." (Doc. 74, Gov't Br. at 13). In light of the undersigned's finding that the stop and search of the vehicle at issue did not violate the Fourth Amendment, the undersigned assumes without deciding that Defendant Griffin, who "asserted a property and possessory interest in the weapons seized" (Doc. 70, Def. Br. at 9), had a legitimate expectation of privacy in the area searched, i.e., "standing," to challenge the search.

[10] Defendant offers nothing but speculation that it was "physically impossible" for Parker to have caught up to the Lincoln within a half mile, i.e., "Officer Parker's pursuit did not start immediately as the vehicle passed him and he had to take some time to ensure it was safe to merge into traffic. Further, assuming his top speed was one hundred miles per hour, it would have taken him an amount of time to reach top speed." (Doc. 70, Def. Br. at 12). Parker testified, however, that traffic was "fairly light" that day, and "there was an immediate break and [he] could get out 'cause it didn't take [him] long to catch up to them." (Tr. 70-71). He also testified that the top speed of his vehicle was 140 miles per hour, and he "[p]ossibly" traveled over a hundred miles per hour in that pursuit. (Tr. 71).

equipment in his car to record the infractions," but waited until his blue lights were activated after the infractions had occurred; and that Parker "issued no citations and/or warnings for the infractions," and offered no explanation for failing to do so.[11] (Id. at 13).

The undersigned finds that Officer Parker credibly testified that the Lincoln was driving in excess of the speed limit, based on his observation that the Lincoln was passing other vehicles, his experience and training in visual estimations of speed, and his observation of the Lincoln's speed while he "paced" it by traveling behind it, as well as his observation that the Lincoln twice crossed into the next lane. Defendants' attempts to undermine the credibility of that testimony are based on unsupported speculation. Defendants have not pointed to evidence that undermines the credibility of Officer Parker's testimony about the speed of the Lincoln or the failure of the driver of the Lincoln to maintain the lane in which it was traveling.

The undersigned therefore finds that the uncontradicted evidence shows Officer Parker had probable cause to stop the Lincoln because he observed it traveling at speeds in excess of the posted speed limit and failing to maintain its lane, violations of O.C.G.A. §§ 40-6-180, 40-6-181 and 40-6-48. See United States v. Purcell, 236 F.3d 1274, 1276 n.5 (11th Cir.) ("A law enforcement officer may legally stop an automobile traveling on the highways if he has probable cause

---

[11] During the hearing, Parker was asked why he did not issue citations for speeding and failure to maintain lane, and he responded, "Basically, with everything that was going on and they were taken to the police department afterwards, I just–I didn't. No particular reason." (Tr. 31-32).

to believe that a traffic violation has occurred." (citing Whren v. United States, 517 U.S. 806, 810 (1996)), cert. denied, 534 U.S. 830 (2001).

**B.     The Warrantless Search of the Lincoln**

"A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law." United States v. Campbell, 920 F.2d 793, 795 (11th Cir. 1991). The burden is on the Government to prove by a preponderance of the evidence that the warrantless search in this case was authorized. "Upon a motion to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983)(citation omitted), cert. denied, 465 U.S. 1023 (1984). See United States v. Matlock, 415 U.S. 164, 177 n.14 ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). "The government bears the burden of proving the voluntariness of the consent." United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984). "In order for consent to a search

to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360. "[V]oluntariness is a question of fact to be determined from all the circumstances when evaluating the validity of a consent to a search." Id. at 358 (internal quotation marks and citation omitted); see also Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)("[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). The non-exclusive list of factors the court must consider in determining whether a consent was voluntary includes "[the] voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." Chemaly, 741 F.2d at 1352 (quoting United States v. Phillips, 664 F.2d 971, 1023-24 (5th Cir. 1981)(Unit B), cert. denied, 457 U.S.1136 (1982)); see also United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996). In Gonzalez, the Eleventh Circuit explained that "the absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that 'where there is coercion, there cannot be consent.' " 71 F.3d at 828 (quoting Bumper v. North Carolina, 391 U.S. 543, 550 (1968)).

Defendants argue that there is no credible evidence that Defendant Judge gave consent to the search. First, they assert that the video of the stop, including

13

the audio recording, does not indicate that Parker asked Judge for consent. (Doc. 70, Def. Br. at 14-15). Next, they assert that "there was no consent to search form introduced [and], although another Jefferson City police officer was on the scene when Parker purportedly obtained consent, the officer was not called by the government." (Id. at 15).

The undersigned finds that Defendant Judge gave his consent to the search and that his consent was voluntarily given. In the first place, the undersigned notes that portions of Parker's conversations with Judge and the other defendants are not audible due to other noise occurring during the stop, particularly the noise of traffic traveling on the interstate. Thus, the fact that the video did not capture the audio portion of Officer Parker's exchange with Defendant Judge when Judge consented to a search of the Lincoln does not show that Judge did not give his consent. The undersigned finds that Officer Parker credibly testified that Judge gave his consent to search the Lincoln. Furthermore, the totality of the circumstances indicates that the consent was voluntarily given and was not withdrawn during the stop. Both Parker's testimony and the video show that Parker spoke cordially with Judge and the other defendants, he did not threaten or coerce Judge, and none of the defendants objected to the search or requested that the search stop. Law enforcement officers did not draw their weapons on Defendants, and Defendants were not restrained at the time consent was given. Under these circumstances, the undersigned finds that the search of the Lincoln was authorized by voluntary consent, and thus, it was not unconstitutional.

C.  **Defendants' Statements**

Defendants argue that any statements they made prior to being advised of their Miranda rights must be suppressed because of the failure to advise them of those rights. (Doc. 70, Def. Br. at 15-16). They also argue that any statements they made after being advised of their Miranda rights must be suppressed because those statements were obtained as the result of the allegedly unconstitutional stop and search. (Id. at 16-19).

To the extent Defendants seek to suppress their statements on the ground that the statements were the fruits of an allegedly illegal stop and search, that ground is without merit because, as discussed *supra,* the stop and search were not illegal. The undersigned turns to Defendants' argument that their pre-Miranda rights advice statements should be suppressed. Specifically, Defendants argue that they were not "free to leave as soon as Judge told [Parker] there were guns in the trunk," and thus, any statements they made from that point until they were given their Miranda rights must be suppressed because the statements were obtained in violation of Miranda. (Doc. 70, Def. Br. at 15-16).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In Miranda, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-

incrimination." Miranda, 384 U.S. at 444.

The protections outlined in Miranda apply only to custodial interrogations, however. It is well-settled that "pre-custodial questioning does not require Miranda warnings." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (citing United States v. Brown, 441 F.3d 1330, 1347-49 (11th Cir. 2006), cert. denied, 549 U.S. 1182 (2007)), cert. denied, 551 U.S. 1138 (2007); see also United States v. Montos, 421 F.2d 215, 222-23 (5th Cir.)("Unless restraint of an individual by law enforcement personnel is 'significant,' Miranda warnings are not required."), cert. denied, 397 U.S. 1022 (1970).[12]

In Miranda, the Court explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. In Street, the Eleventh Circuit explained that the definition of "custody" for Miranda purposes is not co-extensive with the definition of "seizure" for Fourth Amendment purposes:

> [A] seizure does not necessarily constitute custody for Miranda purposes. The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when a reasonable person would not feel free to terminate the encounter with the police. By contrast, a person is in custody for Miranda purposes only when there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

Street, 472 F.3d at 1309-10 (internal citations, quotations and bracketing

---

[12] Decisions of the Fifth Circuit handed down before Oct. 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

omitted).  See also United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) ("We previously have explained, however, that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment -- and thus may be deemed to have been 'seized' by law enforcement -- he will not necessarily be considered in 'custody' for Fifth Amendment purposes." (citing Street, 472 F.3d at 1310)).

The court in Street explained further that the test for whether a person is "in custody" is a "totality of the circumstances determination," and it is objective, as viewed from the perspective of "a reasonable innocent person." Id. at 1309 (citations omitted).  Thus, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." Id. (quoting United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996)).  When applying this test, the court should consider several factors, including "whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" Id. (quoting United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989)).

The undersigned finds that Defendants were not "in custody" for Fifth Amendment purposes when they were questioned prior to being advised of their Miranda rights; therefore, Officer Parker was not required to give them the advice mandated by Miranda . Although Defendants were not "free to leave" during their detention following the traffic stop, the circumstances of their detention at the time Parker questioned them do not indicate that there had been a "formal arrest

or restraint on freedom of movement of the degree associated with a formal arrest" at that time. When Parker questioned Defendant Judge at the rear of the Lincoln, Judge was not handcuffed or restrained or informed that he was under arrest, and Parker had not drawn his weapon. Similarly, when Parker questioned Defendants Dawson and Griffin about their travels and when he asked them about the guns, none of the Defendants was handcuffed, restrained or under arrest, and no weapons were drawn. It was only when Defendant Griffin stated that the guns were his, after Parker had found them in the trunk, that Griffin was placed in a patrol car. (Tr. 24). Thus, the undersigned finds that Defendants were not in custody when they were questioned prior to being advised of their Miranda rights. Therefore, any statements they made in response to pre-Miranda advice questioning need not be suppressed on the ground that the Miranda warnings had not been given.

## Conclusion

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' motions to suppress [Docs. 39 & 41] be **DENIED**.

**IT IS FURTHER ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO REPORTED, RECOMMENDED, and ORDERED** this 7th day of September, 2010.

*Susan S. Cole*
SUSAN S. COLE
United States Magistrate Judge